No. 2--08--0544        Filed:  12-10-08

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| In re BABY GIRL F., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Boone County. |
| | ) | |
| | ) | No. 08--AD--4 |
| (Mark B. and Mary Karl B., Petitioners- | ) | |
| Appellees and Cross-Appellants, v. Krystal F., | ) | Honorable |
| Respondent-Appellant and Cross-Appellee | ) | J. Todd Kennedy, |
| (Ralph L., Jr., Respondent)). | ) | Judge, Presiding. |

JUSTICE BOWMAN delivered the opinion of the court:

This case involves an interstate custody dispute between the Illinois birth mother of Baby Girl F., Krystal F. (respondent-appellant and cross-appellee), and the South Carolina adoptive parents, Mark B. and Mary Karl B. (petitioners-appellees and cross-appellants).  The critical issue is whether a decision by the South Carolina Supreme Court awarding custody to the adoptive parents is entitled to full faith and credit in Illinois.  We determine that the decision is entitled to full faith and credit, and we thus affirm.

I.  BACKGROUND

In April 2006, 20-year-old Krystal, who was seven months pregnant, contacted an Illinois adoption agency called A Baby to Love.  The adoptive parents retained an attorney in South Carolina, Ray Godwin, to help them adopt a baby.  Attorney Godwin worked with A Baby to Love, which matched Krystal with the adoptive parents.  The adoptive parents retained an Illinois attorney,

Denise Patton, to handle the adoption paperwork in Illinois and to appear with Krystal in court. Attorney Patton testified that, even though the adoptive parents paid for her services, she acted in the interest of Krystal, not the adoptive parents.

Prior to the baby's birth, attorney Patton met with Krystal to discuss the various documents that she would need to sign. Attorney Patton went over approximately 11 forms with Krystal, explaining each one. The documents allowed Baby Girl to cross state lines.

With respect to the baby's father, Krystal told A Baby to Love and attorney Patton that she had been raped. Krystal testified that attorney Patton advised her that if the child was the result of a rape, there was no need to notify the father. According to Krystal, she told attorney Patton that the father's name was Ralph, but she did not provide Ralph's last name or address because she did not want him to know about the baby or the adoption. Contrary to Krystal's testimony, attorney Patton testified that Krystal would not tell her the father's first name. According to attorney Patton, Krystal knew the father's first name through friends of friends, but she did not know his last name or his address. Krystal refused to share the father's first name because she was raped, and she wanted to get on with her life and make an adoption plan.

Krystal gave birth to Baby Girl in Rockford, Illinois, on June 16, 2006. At the hospital, Krystal met the adoptive parents and then left the hospital without Baby Girl. The adoptive parents were present at the hospital to provide care for Baby Girl. Attorney Patton did not contact Krystal at the hospital, but she contacted her prior to their scheduled court hearing on June 19, 2006.

On June 19, Krystal and attorney Patton appeared in an Illinois circuit court.[1] At the hearing, Krystal stated that she intended to place Baby Girl up for adoption and that the prospective parents resided in South Carolina. Krystal signed a "Consent to Guardianship," and, after questioning Krystal, the Illinois court waived the appointment of a guardian ad litem and appointed attorney Patton guardian of Baby Girl (June Illinois Guardianship Order) for the purpose of facilitating her transfer to South Carolina. That day, Krystal signed four more documents, including a relinquishment of parental rights, a consent to jurisdiction under South Carolina law, an affidavit of identification, and a consent to adoption. In the consent to jurisdiction document, Krystal acknowledged that the adoptive parents would be filing a South Carolina petition to adopt Baby Girl. The document stated the following:

> "Having been informed about the law in both South Carolina and Illinois, I hereby submit to the jurisdiction of the state of South Carolina. I agree that all matters relating to the adoption of my child, including, but not limited to the right to revoke my Relinquishment, to notice of further proceedings in the adoption and termination of my parental rights, shall be determined in accordance with the laws of the state of South Carolina."

---

[1] Two documents that appear in Krystal's appendix, attorney Patton's petition for guardianship and the transcripts of the June 19, 2006, proceedings, do not appear in the record on appeal. Therefore, we cannot consider them. See Walczak v. Onyx Acceptance Corp., 365 Ill. App. 3d 664, 672 (2006) (generally, materials not taken from the record may not be placed before the reviewing court by way of an appendix). As a result, we derive the following facts from the South Carolina Supreme Court's published decision, issued on January 28, 2008, which is a part of the record.

In the affidavit of identification, Krystal checked a box indicating that she did not know the identity of the father. However, she also inconsistently stated, " 'I was raped and I only knew the birth father through friends of friends. I do not know his full name and will not say his first name.' " In the consent to adoption, she refused to name the father, stating that he had not supported her and had not paid any pre-birth expenses.

On June 20, 2006, the adoptive parents returned to South Carolina with Baby Girl and filed an action for adoption in the family court.

On July 14, 2006, the father, Ralph L., Jr., filed a petition in Illinois, requesting that the court void ab initio the June Illinois Guardianship Order. Ralph's petition alleged that Krystal knew his identity and whereabouts at all times. It also alleged that Krystal had said the baby was born dead. Ralph argued that the Illinois court was without jurisdiction to enter the June Illinois Guardianship Order because he never received notice. Ralph's petition failed to name the adoptive parents as parties.

Upon learning Ralph's identity, the adoptive parents filed an amended adoption petition in the South Carolina family court on July 21, 2006. The adoptive parents requested an emergency hearing, which took place on July 31, 2006. Although Ralph had notice of this emergency hearing, his South Carolina counsel arrived too late to participate. On August 2, 2006, the court issued a temporary order (August South Carolina Order) that (1) granted temporary legal custody of Baby Girl to the adoptive parents; (2) vested jurisdiction in the South Carolina family court; and (3) directed Ralph to take a paternity test. The court additionally ruled that South Carolina was Baby Girl's home state.

On August 4, 2006, Krystal filed a petition in Illinois to vacate her consent to adoption and have Baby Girl returned to her. In an affidavit, Krystal stated that she and Ralph began dating in January 2005 and were living together in September 2005. In October 2005, Krystal filed assault charges against Ralph, and he was arrested. Krystal then found out she was pregnant and contacted an adoption agency, which put her in contact with the adoptive parents. Attorney Patton contacted Krystal to assist with the adoption and told her that the adoptive parents would pay for attorney Patton's services. According to Krystal's affidavit, attorney Patton advised her that Ralph would not need to be notified if she did not list him on the adoption papers. Krystal alleged that attorney Patton had a conflict of interest representing her. The adoptive parents were not named as parties or provided notice of the pleadings. Apparently, however, they received "indirect notice," and Illinois counsel entered a special appearance on their behalf.

On September 8, 2006, the Illinois court vacated ab initio the June Illinois Guardianship Order (September Illinois Order). The court determined that Krystal intentionally failed to disclose Ralph's identity and that the failure to provide him notice deprived the court of jurisdiction to grant the guardianship. As a result, the court ordered that Baby Girl be returned to Krystal in Illinois.

Ralph then filed a motion in South Carolina to vacate the August South Carolina Order awarding the adoptive parents temporary custody of Baby Girl. The court held a hearing on Ralph's motion on October 20, 2006, and made a ruling on December 15, 2006. According to the court, Illinois first exercised jurisdiction over Baby Girl when it issued the June Illinois Guardianship Order, and Illinois exercised continuing jurisdiction when it vacated that order in its September Illinois Order. After conducting a telephone conference with the presiding Illinois judge, the South

Carolina court determined that Illinois was the home state of Baby Girl. The court granted Ralph's motion to vacate based on its lack of subject matter jurisdiction (December South Carolina Order).

In the meantime, Krystal filed a custody action in South Carolina on December 7, 2006, requesting the court to enforce the September Illinois Order that awarded Krystal custody of Baby Girl. Krystal did not name Ralph as a party in this action. The adoptive parents answered and filed a counterclaim and a cross-claim, and they named Ralph as a party. Following a hearing, the court issued a ruling on February 13, 2007 (February South Carolina Order). The court granted Krystal's request to enforce the September Illinois Order and dismissed the adoptive parents' counterclaim and cross-claim. In addition, the court ordered the adoptive parents to deliver Baby Girl to Krystal's counsel no later than February 23, 2007.

The adoptive parents appealed both orders and petitioned the South Carolina Court of Appeals for a writ of supersedeas for leave to enforce the August South Carolina Order granting them temporary custody of Baby Girl. The appeal and the petition were denied, and the adoptive parents surrendered Baby Girl on February 23, 2007. At that time, Baby Girl was over eight months old. The adoptive parents appealed to the South Carolina Supreme Court.

Prior to the November 15, 2007, oral argument before the South Carolina Supreme Court, Ralph's counsel requested to be relieved based on his failure to pay her. Ralph submitted an affidavit in which he stated that he understood that, if he did not hire replacement counsel, the court could presume that it was his intention to waive his rights. Ralph did not retain replacement counsel and did not appear pro se at the oral argument.

On January 28, 2008, the South Carolina Supreme Court issued a decision (January South Carolina Supreme Court Decision) reversing the February South Carolina Order. It reasoned that the June Illinois Guardianship Order was not a "custody determination" within the meaning of a federal act, the Parental Kidnapping Prevention Act of 1980 (PKPA) (28 U.S.C. §1738A (2000)), and thus it was not first in time. The court noted that there were no "pleadings" for the guardianship proceeding; there was no written order in the record; and Baby Girl never lived with attorney Patton, meaning that she never had physical custody of the child and was not named guardian for the purpose of becoming a parent. Rather, the purpose of the guardianship proceeding was a limited one; namely, making attorney Patton a temporary guardian in order to facilitate the transfer of Baby Girl from Illinois to South Carolina for the subsequent adoption.

The South Carolina Supreme Court stated that, because the June Illinois Guardianship Order was not a custody determination, Illinois did not have jurisdiction over the custody of Baby Girl prior to South Carolina's exercise of jurisdiction in August, and therefore the August South Carolina Order granting temporary legal custody to the adoptive parents was first in time. Without initial jurisdiction, it logically followed, Illinois did not have continuing jurisdiction to issue its September Illinois Order vacating the June Illinois Guardianship Order. In addition, the September Illinois proceedings were flawed in that the adoptive parents were not given notice or an opportunity to be heard.

The South Carolina Supreme Court further found that neither South Carolina nor Illinois qualified as the home state of Baby Girl. Nevertheless, Baby Girl had a significant connection to South Carolina in that she had been living there since she was four days old, and South Carolina was the only state in which there was evidence concerning her care and personal relationships.

The South Carolina Supreme Court concluded that the February South Carolina Order incorrectly afforded full faith and credit to the Illinois September Order. The South Carolina Supreme Court thus reinstated the August South Carolina Order awarding custody of Baby Girl to the adoptive parents, and Krystal was given 15 days to return Baby Girl.

On February 15, 2008, the adoptive parents moved in South Carolina for a rule to show cause as to why Krystal should not be held in contempt for failing to return Baby Girl by February 12, 2008. On March 5, 2008, the court found Krystal in willful contempt of the January South Carolina Supreme Court Decision (March South Carolina Contempt Order).

On March 7, 2008, the adoptive parents moved in Illinois to register the January South Carolina Supreme Court Decision and the March South Carolina Contempt Order. The court registered the judgments in Illinois but stayed execution of the March South Carolina Contempt Order until March 11, 2008.

On March 11, 2008, Krystal and her counsel appeared at the hearing. The court ordered that the March South Carolina Contempt Order was stayed until further court order. The matter was continued to April 18, 2008.

On March 31, 2008, Krystal filed various motions contesting the registration of the foreign judgments under the provisions of the Uniform Child-Custody Jurisdiction and Enforcement Act (UCCJEA) (750 ILCS 36/101 et seq. (West 2004)). Krystal also filed a motion to vacate the orders and a motion to appoint a guardian ad litem.

At the April 18, 2008, hearing, Krystal orally moved for a substitution of judge. The court denied this motion, and it also denied Krystal's motion to appoint a guardian ad litem. The court noted that the majority of Krystal's motions concerned whether the South Carolina Supreme Court

had jurisdiction to make a custody determination. The matter was continued to May 16, 2008, for a hearing. Because Ralph had not received notice of the March 11, 2008, hearing, the adoptive parents were ordered to notify Ralph of the May 16, 2008, hearing. In response to the adoptive parents' concerns that Krystal was delaying the case and attempting to relitigate issues other than jurisdiction, the court advised Krystal that testimony at the next hearing would be limited to jurisdictional issues.

Ralph received notice of the May 16, 2008, hearing on April 23, 2008. At the hearing, Ralph appeared pro se, and he filed a motion requesting more time to hire an attorney. The court denied this request, noting that Ralph had not presented any valid reason for a continuance. Krystal filed several motions, including a motion to dismiss and/or transfer due to improper venue; a motion for discovery seeking to depose several individuals; and a motion for DNA testing and fingerprinting, based on a letter that the adoptive parents allegedly sent to Krystal nearly one year after Baby Girl was born. (The adoptive parents denied sending the unsigned letter, which offered money to Krystal.) Krystal argued that the South Carolina Supreme Court lacked jurisdiction and that there was fraud in the procurement of the judgment in that Krystal's consent was invalid. The adoptive parents responded with a motion to strike Krystal's motions.

After the court heard testimony from the adoptive parents, Krystal's mother, and Krystal, the case was continued to June 9, 2008. On June 9, 2008, Ralph again appeared pro se, although Krystal's attorneys filed a motion for appointment of counsel for an indigent party. The court denied this motion for two reasons. First, the attorneys did not have standing to bring a motion on Ralph's behalf without entering an appearance for him. Second, the hearing did not involve a termination of parental rights; instead, it was a hearing to contest the registration of a foreign judgment, which

meant he was not entitled to counsel. The court heard more testimony, including that of attorney Patton, and rendered its decision the next day.

The court found as follows. First, in registering the foreign judgment, the adoptive parents substantially complied with the notice requirement in section 305(b) of the UCCJEA (750 ILCS 36/305(b) (West 2004)). Although notice was not sent out by the clerk when the adoptive parents orally moved to register the foreign judgment, the court ordered that notice be sent to Krystal so that she would have the opportunity to object. Four days later, Krystal did contest the registration and, ultimately, she received an evidentiary hearing. In addition, at the April 18, 2008, hearing, the court ordered that Ralph receive notice of the hearing to contest the registration of the foreign judgment. Because of the nature of the hearing, Ralph was not entitled to free counsel, so there was no due process violation.

The court also noted the ways in which the adoptive parents had failed to comply with the statute. Under section 305(a)(2), orders sought to be registered need to be certified. While the March South Carolina Contempt Order had been certified, the January South Carolina Supreme Court Order had not. Also, contrary to that section, there was no proof that the orders had not been modified. Finally, the names and addresses of the adoptive parents and Krystal were required by section 305(a)(3). While these were not jurisdictional or constitutional requirements, they needed to be satisfied to register the foreign judgment.

The court reiterated that the hearing did not involve termination of parental rights, it was to contest the registration of a foreign judgment. The court noted that, under section 305(d), jurisdiction is a basis for challenging registration, and Krystal had argued that South Carolina lacked jurisdiction because it was not Baby Girl's home state. On this point, the court agreed with the South

Carolina Supreme Court that neither Illinois nor South Carolina was Baby Girl's home state. The next inquiry under the statute was which state had the most significant connection. The court noted that, when the August South Carolina Order was issued, Baby Girl was living in and had adequate contacts with South Carolina, allowing that court to assume jurisdiction. The court agreed with the South Carolina Supreme Court that, after South Carolina made the initial custody determination, it had exclusive, continuing jurisdiction, and the Illinois court did not have jurisdiction to modify that order.

With respect to notice, the trial court found that Ralph had notice of the South Carolina proceedings, and specifically of the hearing at which the August South Carolina Order was entered. The court was unclear whether Krystal had notice of that hearing but, even if she did not, it did not matter, because she had already consented to the adoption. Also, there was no evidence that Krystal's consent was fraudulently obtained. On the contrary, Krystal had confirmed with A Baby to Love and attorney Patton that she wished to place Baby Girl up for adoption. The court determined that the January South Carolina Supreme Court Decision was entitled to full faith and credit and would be enforced as soon as the adoptive parents complied with the statutory requirements highlighted above.

The parties next appeared in court on June 12, 2008. The court confirmed the registration of the January South Carolina Supreme Court Decision and the March South Carolina Contempt Order, finding that they were entitled to full faith and credit in Illinois. The adoptive parents did not seek to enforce the portion of the contempt order requiring Krystal to serve jail time. They requested enforcement of only the January South Carolina Supreme Court Decision, which ordered Krystal to return Baby Girl to the adoptive parents.

Krystal moved to reconsider and presented an alternative argument. As the court noted, Krystal's argument all along had been that the June Illinois Guardianship Order was void ab initio, meaning that there was no legal authority to transfer Baby Girl to South Carolina and that South Carolina did not have jurisdiction and thus could not have made the initial child custody determination. Now, Krystal argued that the June Illinois Guardianship Order was the initial child custody determination, or first in time, which meant that Illinois had continuing and exclusive jurisdiction. The court stated that Krystal could not have it both ways: arguing on the one hand that the June Illinois Guardianship Order was void ab initio and invalid for the purpose of transferring Baby Girl to South Carolina, and arguing on the other hand that it was valid for the purpose of being the first child custody determination. In any event, the court agreed with the South Carolina Supreme Court that attorney Patton's guardianship was not a traditional custody order because she "was not asking for her own custody," the guardianship being an administrative or procedural matter to help transfer Baby Girl over state lines. Moreover, if the June Illinois Guardianship Order was void ab initio, then the order did not exist, and it could not be first in time. For both of those reasons, the court maintained its position that the August South Carolina Order was first in time.

Also that day, Krystal filed an emergency motion to stay enforcement of the order pending appeal, pursuant to Supreme Court Rule 305(b) (210 Ill. 2d R. 305(b)). The court noted that there was a conflict between Rule 305(b) and section 314 of the UCCJEA (750 ILCS 36/314 (West 2004)), which prohibits staying an order pending appeal unless the court enters a temporary emergency order. Reasoning that the rule trumped the statute, the court stayed enforcement of the June 12, 2008, order, which ordered Krystal to return Baby Girl to the adoptive parents.

On June 17, 2008, Krystal filed a notice of appeal. On June 19, 2008, the adoptive parents cross-appealed and filed an emergency motion to vacate the stay. This court, with one justice dissenting, denied the adoptive parents' motion to vacate the stay. We turn now to the issues raised on appeal.

## II. ANALYSIS

Krystal's three contentions of error are that: (1) Illinois made the initial child custody determination and retained exclusive and continuing jurisdiction; (2) the trial court registered the child custody determination of a South Carolina court that lacked jurisdiction; and (3) Ralph did not receive proper notice of the registration proceedings. The problem with all of these arguments, however, is that they are premised on the UCCJEA, which does not apply to adoption proceedings.

Our legislature adopted the UCCJEA on January 1, 2004, thereby replacing the Uniform Child Custody Jurisdiction Act (750 ILCS 35/1 et seq. (West 2002)) (UCCJA). One major difference between the UCCJA and the UCCJEA is in their applicability to adoption proceedings. Although the term "adoption" did not appear in the UCCJA's definitions of child custody determinations, Illinois courts construed the UCCJA to apply to adoption proceedings. See Noga v. Noga, 111 Ill. App. 3d 328, 332 (1982) (an adoption proceeding is considered to be a custody proceeding within the scope of the UCCJA). However, unlike the UCCJA, section 103 of the UCCJEA expressly states that the "Act does not govern an adoption proceeding." (Emphasis added.) 750 ILCS 36/103 (West 2004); see also People ex rel. A.J.C., 88 P.3d 599, 609 (Colo. 2004) (the most important and ultimately dispositive provision of the UCCJEA for our purposes is that the UCCJEA does not govern an adoption proceeding).[2] While the issue in this case is whether Illinois

---

[2]The UCCJEA's exclusion of adoptions creates an obvious gap in the jurisdictional legislation

should give full faith and credit to a South Carolina Supreme Court decision, that decision is the direct result of the adoption action that the adoptive parents filed in the South Carolina family court. Therefore, the UCCJEA does not apply. Unfortunately, it appears that neither the parties nor the trial court were aware of this exclusion in the UCCJEA, as much time and energy were devoted to arguments based on that statute.       In any event, the South Carolina Supreme Court correctly based its decision on a federal statute, the PKPA. Congress enacted the PKPA in 1980 to remedy the weaknesses of the UCCJA, and it is a uniform federal statute governing child custody jurisdiction disputes. In re Marriage of Michalik, 172 Wis. 2d 640, 648-49, 494 N.W.2d 391, 394 (1993). In addition to kidnapping and child abduction, the PKPA applies generally to interstate custody disputes (In re Marriage of Wiseman, 316 Ill. App. 3d 631, 638 (2000)) and specifically to adoptions. See People ex rel. A.J.C., 88 P.3d at 611 (because the PKPA does not specifically exclude adoptions, it is assumed that it applies to adoption proceedings); see also In re the Custody of K.R., 897 P.2d 896, 899-900 (Colo. App. 1995) (the majority of jurisdictions that have addressed the issue have concluded that the PKPA applies to adoption proceedings). As noted by the South Carolina Supreme Court, the primary purpose of the PKPA is to promote cooperation between state courts regarding custody determinations; to facilitate the enforcement of custody and visitation decrees of sister states; to discourage continuing interstate controversies over child custody, in the interest of a more stable home environment and of secure family relationships for the child; and to avoid jurisdictional competition and conflict between state courts in matters of child custody that have in the past

---

governing interstate adoptions. To fill this void, the drafters of the UCCJEA intended that state legislatures also adopt the Uniform Adoption Act. People ex rel. A.J.C., 88 P.3d at 609.

resulted in shifting children from state to state with harmful effects on their well-being. 28 U.S.C. §1738A (1982).

While Krystal argues that the federal PKPA is irrelevant, and that we should not give the South Carolina Supreme Court Decision deference because it relied on that federal statute, this view is plainly wrong. It is clear that Illinois, South Carolina, and other states apply the PKPA (as well as their versions of the UCCJA) to interstate custody disputes. See In re Marriage of Kneitz, 341 Ill. App. 3d 299, 305 (2003) (under the PKPA and the UCCJA, Illinois rendered the initial custody decision and continued to have exclusive jurisdiction); Arnal v. Fraser, 371 S.C. 512, 518, 641 S.E.2d 419, 422 (2007) (both the PKPA and the UCCJA govern when multiple states claim jurisdiction over a child custody dispute); see also Clay v. Burckle, 369 S.C. 651, 655, 633 S.E.2d 173, 176 (App. 2006) (the PKPA and the UCCJA govern the subject matter jurisdiction of state courts to rule in interstate custody disputes). Moreover, although Krystal contends that the Illinois trial court did not rely on the PKPA in reaching its decision, we may affirm on any basis in the record. See Burton v. Airborne Express, Inc., 367 Ill. App. 3d 1026, 1033 (2006) (the trial court may be affirmed on any basis in the record, without regard to whether the trial court relied upon that ground or whether the trial court's rationale was correct).

The effect of the January South Carolina Supreme Court Decision was to reinstate the August South Carolina Order awarding custody of Baby Girl to the adoptive parents.[3] If the August South Carolina Order was consistent with the provisions of the PKPA, Illinois must enforce it. People ex

_____

[3]When the August South Carolina Order was entered, in 2006, South Carolina was governed by the UCCJA. Eventually, on June 8, 2007, South Carolina enacted the UCCJEA. For the proceedings relevant to this appeal, however, the UCCJA was in effect.

rel. A.J.C., 88 P.3d at 611 (the PKPA imposes a duty on a state to enforce a child custody determination entered by a court of a sister state if the determination is consistent with the federal statute's provisions). Once a state exercises jurisdiction consistently with the PKPA, no other state may concurrently exercise jurisdiction over the custody dispute, even if it would have been empowered to take jurisdiction in the first instance, and all states must accord full faith and credit to the first state's ensuing custody decree. In re Marriage of Michalik, 172 Wis. 2d at 649-50, 494 N.W.2d at 394-95. The South Carolina Supreme Court found that, under both the PKPA and the UCCJA, South Carolina had jurisdiction when it issued the August South Carolina Order. In reviewing the factual history of this case, we agree. As we discuss, the issue turns on whether Illinois or South Carolina issued the first custody determination.

Three days after Baby Girl was born, attorney Patton and Krystal appeared in court in Illinois. Attorney Patton was appointed guardian of Baby Girl, and Krystal signed a consent to guardianship, a relinquishment of parental rights, a consent to jurisdiction under South Carolina law, an affidavit of identification, and a consent to adoption. According to the court, there was no evidence that Krystal's consent was fraudulently obtained. The next day, the adoptive parents returned to South Carolina with Baby Girl and filed an action for adoption there.

Approximately one month later, the adoptive parents filed an amended adoption petition after learning of Ralph's identity. Ralph was provided notice of an emergency hearing on the matter, but his counsel arrived too late to participate. On August 2, 2006, the court issued an order granting temporary legal custody of Baby Girl to the adoptive parents, vesting jurisdiction in South Carolina, and directing Ralph to take a paternity test.

In the meantime, Ralph had filed a petition in Illinois, requesting that the court void ab initio the June Illinois Guardianship Order, and Krystal had filed a petition in Illinois to vacate her consent. On September 8, 2006, the Illinois court vacated ab initio the June Illinois Guardianship Order.

As the South Carolina Supreme Court recognized, it is necessary to determine which state issued the first custody determination. After looking at the June Illinois Guardianship Order, the August South Carolina Order, and the September Illinois Order, the court determined that the August South Carolina Order was first in time. In reaching this conclusion, it rejected the notion that the June Illinois Guardianship Order, entered at what was undisputedly the first court proceeding, constituted a "custody determination" within the meaning of the PKPA.

At oral arguments, we instructed the parties to argue whether the June Illinois Guardianship Order constituted a "custody determination" under the PKPA. In analyzing this issue, we begin by setting forth the relevant terms under the federal statute. The PKPA defines a "custody determination" as a "judgment, decree, or other order of a court providing for the custody of a child, and includes permanent and temporary orders, and initial orders and modifications." 28 U.S.C. §1738A(b)(3) (1982). It then defines "physical custody" as "actual possession and control of a child." 28 U.S.C. §1738A(b)(7) (1982). Finally, a "person acting as a parent" under the PKPA means a "person, other than a parent, who has physical custody of a child and who has either been awarded custody by a court or claims a right to custody." 28 U.S.C. §1738A(b)(6) (1982).

According to the South Carolina Supreme Court, the June Illinois Guardianship Order was not a "custody determination" because there were no pleadings filed in connection with the proceeding;[4] attorney Patton never had physical custody of Baby Girl; she was not named guardian

---

[4]It is unclear whether the South Carolina Supreme Court considered attorney Patton's petition

for the purpose of acting as a parent; she never claimed a right to Baby Girl's custody; and Baby Girl never lived with her. Rather, attorney Patton was named a temporary guardian for the limited purpose of facilitating both the interstate transport of Baby Girl from Illinois to South Carolina and the subsequent South Carolina adoption. In contrast to the limited purpose of the guardianship in this case, the court reasoned that the PKPA clearly envisions physical custody determinations.

To support her position that the June Illinois Guardianship Order constituted a custody determination, Krystal points to the "Letters of Office" in the record stating that attorney Patton was "authorized to have under the direction of the court the custody of the minor and to do all acts required of her by law." However, we agree with the South Carolina Supreme Court and the Illinois trial court that the guardianship in this case is distinct from a guardianship that awards custody. We note that a "guardian may be appointed either for all purposes or for specific purposes." (Emphasis added.) Black's Law Dictionary 712 (7th ed. 1999). Here, the guardianship had the specific and limited purpose of facilitating the transfer of the child; it was not for the purpose of awarding physical custody. The Illinois trial court specifically found that attorney Patton took on this role as an "administrative matter to help transfer," as opposed to seeking custody of Baby Girl. The Illinois trial court stated that attorney Patton "was not seeking custody, was not seeking any parental rights, was not seeking control over upbringing, leave to do any medical treatment, leave to enroll the child," or "any of the things that would normally be" done when seeking custody of a child.

While it is true that the "Letters of Office" gave attorney Patton "custody" of Baby Girl, the guardianship order must be viewed contextually given the purpose of the proceeding. As stated, the

for guardianship.

purpose of the proceeding was to file the necessary paperwork in Illinois to allow the adoptive parents to transfer Baby Girl and to file adoption proceedings in South Carolina. In serving as the child's guardian, attorney Patton was not a "person acting as a parent" or a person seeking "physical custody" as defined by the PKPA. Thus, the limited guardianship in this case did not constitute a "custody determination" under the PKPA. It seems nonsensical that the very proceeding intended to elicit Krystal's consent to the adoption and give South Carolina jurisdiction be interpreted as the initial "custody determination" entitling Illinois to continuing jurisdiction. See 28 U.S.C. §1738A(d) (1982) (providing continuing jurisdiction to the state that has made a child custody determination consistent with the provisions of the PKPA).

Krystal cites no authority for the proposition that a guardian who was appointed merely to facilitate the transfer of a child, and who never retained physical custody of the child, amounts to a custody determination as contemplated by the PKPA. In fact, this case is easily distinguished from other cases in which the guardianship conferred physical custody of the child to the named guardian. See Murphy v. Danforth, 323 Ark. 482, 488, 915 S.W.2d 697, 700-01 (1996) (where the case involved a petition for guardianship, rather than the more usual chancery court determination of child custody, the PKPA was applicable because the temporary appointment was to be made permanent, thus having the effect of permanently determining custody and interfering with other State's custody orders); see also Ray v. Ray, 494 So. 2d 634, 637 (Ala. Civ. App.1986) (guardianship appointment of paternal aunt who had physical custody of the child for two years was a custody determination within the meaning of the PKPA).

Therefore, the first custody determination under the PKPA is the August South Carolina Order giving temporary legal custody to the adoptive parents. After South Carolina made the initial

custody determination, it follows that Illinois did not have jurisdiction to issue the September Illinois Order that voided the June Illinois Guardianship Order. A state shall not modify another state's custody determination made consistently with the PKPA. 28 U.S.C. §1738A(a) (1982). Thus, the South Carolina Supreme Court correctly determined that the September Illinois Order violated the PKPA.

Moreover, even if we were to hold otherwise, our result would not change. If the June Illinois Guardianship Order was a custody determination, and thus first in time, South Carolina was still entitled to modify the Illinois order under the PKPA. The PKPA allows a court to modify a custody determination of another state if that court has jurisdiction and the other court no longer has jurisdiction. See 28 U.S.C. §1738A(f) (1982); see also In re Marriage of Kneitz, 341 Ill. App. 3d at 305 (under the PKPA, a State court may modify the custody decision of another state court only if the second state court has jurisdiction and the first State court no longer has jurisdiction). In this case, both of those requirements were satisfied. First, while Krystal argues that South Carolina lacked jurisdiction to enter the August South Carolina Order, we reject that argument, as we discuss below. Second, Illinois no longer had jurisdiction based on Krystal's consent to South Carolina jurisdiction. It is undisputed that, at the June Illinois guardianship proceeding, Krystal signed a consent to jurisdiction under South Carolina law in which she acknowledged that the adoptive parents would be filing a South Carolina petition to adopt Baby Girl. Thus, even if we were to accept Krystal's argument that the June Illinois Guardianship Order was the first custody determination, the effect of that proceeding was not to give Illinois the exclusive right to proceed. Rather, it was to give South Carolina jurisdiction to proceed with the adoption.

As stated, Krystal's next argument is that South Carolina lacked jurisdiction to enter the August South Carolina Order, because Baby Girl did not have a significant connection with that state. Because Baby Girl was born in Illinois, but within four days of birth was transported to South Carolina, the South Carolina Supreme Court found that Baby Girl had no home state. The Illinois trial court agreed. When a child has no home state, the PKPA and the UCCJA in South Carolina allow jurisdiction if it is in the best interest of the child. See 28 U.S.C. §1738A(c)(2)(B) (1982) (a court has jurisdiction if it is in the best interest of the child that a court of such state assume jurisdiction because the child and his parents have a significant connection with such state other than mere physical presence and if substantial evidence is available concerning the child's present or future care, protection, training, and personal relationships); S.C. Code Ann. §20--7--788(a)(2) (West 1976) (same).

Again, we agree with the South Carolina Supreme Court that Baby Girl had a significant connection with South Carolina. When the August South Carolina Order was issued, Baby Girl had been living with the adoptive parents since she was four days old, and the adoptive parents had filed an adoption action in the South Carolina family court. It was in Baby Girl's best interest to have South Carolina assume jurisdiction because South Carolina was the only state in which there was evidence concerning her care and personal relationships. Under both the PKPA and South Carolina's UCCJA, therefore, South Carolina had jurisdiction when it entered the August South Carolina Order.

Krystal's final arguments regarding improper notice of the registration of the foreign custody order fail for two reasons. First, they are premised on the UCCJEA, which we have already stated is inapplicable to this case. Second, they seek redress on behalf of Ralph, who is not a party to this appeal. See South Park Commissioners v. Livingston, 344 Ill. 368, 372 (1931) (a party in a reviewing court will not be permitted to take advantage of an error that does not injuriously affect

himself or his interests). Although it is not necessary to consider Krystal's arguments regarding notice, we do note that the trial court found that Ralph had notice of the South Carolina proceedings, specifically the hearing at which the August South Carolina Order was entered.

As a final matter, the adoptive parents cross-appealed regarding the trial court's decision to stay enforcement of its order pending appeal. According to the adoptive parents, the trial court's decision to stay the order pursuant to Supreme Court Rule 305(b) violated section 314 of the UCCJEA (750 ILCS 36/314 (West 2004)). We do not consider this issue, because the UCCJEA does not apply in this case and because the issue is rendered moot by the resolution of this appeal. See Chicorp, Inc. v. Bower, 336 Ill. App. 3d 132, 137 (2002) (an issue is moot if there remains no live controversy between the parties or the resolution of the issue will have no practical effect on the existing controversy).

## III. CONCLUSION

For the reasons stated, the January South Carolina Supreme Court Decision and the March South Carolina Contempt Order are entitled to full faith and credit in Illinois. Therefore, we affirm the judgment of the Boone County circuit court and remand the cause with directions to lift the stay and set a date for the expeditious turnover of Baby Girl to the adoptive parents.

Affirmed and remanded.

HUTCHINSON and BURKE, JJ., concur.